UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

LINDA FOWLER,

               Plaintiff,

vs.

WAL-MART STORES, INC.,

               Defendant

Case No.: 2:16-cv-00450-JCM-GWF

**ORDER**

**Re: Motion (ECF No. 21)**

        This matter is before the Court on Plaintiff's Motion to Strike Defendant's Answer (ECF No. 21), filed on January 18, 2017. Defendant filed its Opposition (ECF No. 23) on February 1, 2017, and Plaintiff filed her Reply (ECF No. 33) on February 13, 2017. Also before the Court is Plaintiff's Motion to Strike Declarations (ECF No. 29), filed on February 8, 2017. The Court conducted a hearing in this matter on February 23, 2017.

## BACKGROUND

        On October 27, 2013, Plaintiff Linda Fowler slipped and fell on a foreign substance at Defendant's Wal-Mart Store located at 5200 S. Fort Apache Rd., Las Vegas, Nevada.[1] According to a witness statement completed by the store's then assistant manager, Sara Bollinger, the slip and fall accident occurred at approximately 2:40 P.M. in a customer aisle in the store's garden center. *Motion* (ECF No. 21), *Exhibit 6*. In her motion, Plaintiff describes the substance as "a slick foreign soap-like or gel-like substance." *Id.* at pg. 3. In her answers to interrogatories dated June 8, 2016, she described it as "a slightly viscous liquid substance." *Id.* at *Exhibit 5*, pg. 5. In her deposition taken on July 21, 2016, Plaintiff described the substance as "thick and sticky and like a gel is the best way I can describe

---

[1] Plaintiff filed the instant civil action in the District Court, Clark County, Nevada on October 8, 2015. *Petition for Removal* (ECF No. 1), *Exhibit B*. Defendant removed the action to this Court on March 2, 2016. *Id.* Discovery in this case closed on November 28, 2016. *See Order* (ECF No. 18).

it." *Opposition* (ECF No. 23), *Exhibit F*, Plaintiff's deposition, pg. 60. Ms. Bollinger, who responded to the accident location, reported that there "was some kind of fluid on the floor and a skid mark where [Plaintiff] fell." *Motion* (ECF No. 21), *Exhibit 6*. At her deposition, Ms. Bollinger described the substance as a "gooey substance;" "Something sticky, not slippery;" "Something that would be sticky, like gooey, something not water." *Id.* at *Exhibit 9*, Bollinger deposition, pgs 11-12.

      Ms. Bollinger took four photographs of the substance on the floor in the aisle where Plaintiff fell. *Id.* at *Exhibit 1*, photographs. The floor was concrete and the substance depicted in the photographs is clear or yellowish-clear in color. Ms. Bollinger did not identify what the substance was or where it came from. *Id.* at *Exhibit 9*, pg. 12. She did not determine how long it had been on the floor. To her knowledge no else at Wal-Mart made any determinations on these matters. *Id.* at pgs. 12-13. Ms. Bollinger testified that Wal-Mart did not have any record of the time the floor was last inspected before the accident, or of the condition of the floor prior to the accident. *Id.* at pg. 14. The only investigation Ms. Bollinger conducted on October 27, 2013 was to take pictures of the foreign substance and to see that relevant video was preserved. *Id.* at pg. 58. Ms. Bollinger did not interview any employees to determine if they had spilled anything in the subject aisle. She did not recall whether she walked around the area to look for something that might have been the source of the substance. She did not attempt to determine who was the last employee in the aisle prior to the fall. *Id.* at pg. 59.

      On October 30, 2013, three days after the accident, Ms. Fowler's attorney sent a letter to Wal-Mart's claims adjuster, Sedgwick Claims Management Services, advising that he represented Ms. Fowler in her claim for personal injuries arising from the accident. *Motion* (ECF No. 21), *Exhibit 7*. The attorney requested that Wal-Mart preserve and forward copies of any statements obtained from Ms. Fowler, the incident report, the names and addresses of any witnesses, and "all video recordings related to this incident, and copies of any photographs taken related to this incident." *Id.* Sedgwick responded to the attorney's letter on November 12, 2013, but did not address his requests. *Id.* at *Exhibit 8*.

      On October 27, 2016, Plaintiff served a second amended notice of a Rule 30(b)(6) deposition of Defendant Wal-Mart to be taken on November 14, 2016. The amended notice listed the following categories for inquiry at the deposition:

      1.      Investigation of the subject accident of October 27, 2013;

2. The safety standards of Wal-Mart Stores regarding preventing slips/trips and falls as of the subject accident of October 27, 2013;

3. Wal-Mart Stores safety policies and procedures regarding preventing slips/trips and falls as of the subject accident of October 27, 2013;

4. Training and supervision regarding safety which was provided to employees of Wal-Mart Stores;

5. The surveillance videos at the subject Wal-Mart Stores on the day of the accident which were capable of capturing video footage relevant to the plaintiff's fall, the efforts taken to preserve surveillance video of the accident and of the events surrounding the accident and the reasons why Wal-Mart Stores has not preserved surveillance video that existed as of October 27, 2013.

*Opposition* (ECF No. 23), Exhibit C.

Defendant designated Ms. Bollinger, who is now co-manager of the Wal-Mart store, as its Rule 30(b)(6) deponent. *Motion* (ECF No. 21), *Exhibit 9*, Bollinger deposition. Ms. Bollinger was questioned about a Wal-Mart document entitled "Preservation Directive" which stated in part as follows:

Q. . . . "The company may have a legal obligation to preserve information that is potentially relevant to this incident. Accordingly, you must immediately search for and preserve paper and electronic documents, data and physical evidence, including but not limited to the following." And then it says right underneath "evidence" in the first box, can you read everything that's said in that box?

A. "Surveillance video one hour before and one hour after depicting where the incident occurred, and any condition, e.g. pallet, end cap, cart, et cetera involved. If the incident involved an identified substance, also collect video from the area where any product containing the substance was displayed or sold."

*Id.* at *Exhibit 9,* Bollinger deposition, pg. 36.

The document also instructed store personnel to collect two copies of video on DVD and contained a place for the employee to initial that this had been done, or to provide an explanation if there was no video. The document for the subject incident was not completed to indicate whether video had been preserved. *Id.* at pgs 36–37.[2] Ms. Bollinger testified that the employee responsible for

---

[2]Neither party included the "Preservation Directive" document as an exhibit. The Court must therefore rely on the deposition testimony as to its contents.

3

obtaining and preserving relevant surveillance video recordings is known as an "Asset Protection Associate" or "AP" associate. The AP associate on duty at the time of Plaintiff's accident was Arveta Nolan. *Id.* at pgs. 33–34.

During the deposition, Ms. Bollinger was shown another Wal-Mart document which stated that "[i]t is essential to pull any CCTV video immediately following the incident/accident, even if the incident/accident occurs in the general area or next aisle over from where the camera is located." *Id.* at pg. 60:6–10. As quoted by Plaintiff's counsel, the document also stated:

> Q. Then it says, "Obtain video at least one hour prior to and one hour after the incident." Now we agree that this was done for the PTZ 8 camera, right, one hour before and one hour after, although it was pointed away from the site of the fall until shortly after it happened, correct?
>
> A. Correct.

*Motion* (ECF No. 21), *Exhibit 9*, Bollinger deposition, pg. 50:15-21.

Near the beginning of the deposition, Ms. Bollinger was asked to describe the surveillance cameras that were located in the garden center area of the store. She testified there were four cameras. Two fixed cameras were directed at the two customer check-out counters. A third fixed camera faced the fire exit. The fourth camera, known as a "PTZ 8," for pan, tilt zoom, was located above the garden center floor roughly opposite from the aisle in which Plaintiff fell. This camera could be rotated to face in different directions from a remote control device in the store's video room. Ms. Bollinger testified that prior to Plaintiff's accident, the PTZ 8 camera was facing toward the customer checkout counters and away from the aisle where the accident occurred. After the accident was reported, the PTZ 8 camera was rotated to view the aisle in which the accident occurred. *Id.* at pgs 26–29. Ms. Bollinger drew a rough diagram to indicate the locations of the four cameras. *Id.* at pg. 28; *Motion* (ECF No. 21), *Exhibit 10*. A copy of Ms. Bollinger's diagram is attached to this order.

After Ms. Bollinger completed the rough diagram indicating the four camera positions, Plaintiff's counsel inquired as follows:

> Q. What about the ones right here? [apparently pointing to a place on the diagram]
>
> A. I don't know anything about those ones.

4

> Q.  I've seen it myself so I know its there, and I'm a little surprised that it wouldn't have been mentioned. So you come into this deposition today and you have no knowledge of any camera which is on the opposite side of the area where the fall occurred, but you have no knowledge of that camera?

*Exhibit 9*, Bollinger deposition, pg. 29:4–13 (bracketed statement added by the Court).

Plaintiff's counsel then showed Ms. Bollinger a photograph of the dome for the camera he was talking about. *Id.* at pg. 30:10–11. The photograph showed a camera dome on a pole descending from the ceiling near the back wall of the garden center and above the row of shelves on the right side of the aisle in which Plaintiff fell. *Motion* (ECF No. 21), *Exhibit 11*. Ms. Bollinger testified that she had no knowledge of that camera. *Id.* at *Exhibit 9*, Bollinger deposition, pgs. 30–32. Ms. Bollinger's testimony indicates that she was confused about the information raised by Plaintiff's counsel regarding this camera. During the remainder of the deposition, this camera was referred to as the "east camera." Plaintiff's counsel asked Ms. Bollinger if she had any personal knowledge of anyone actually pulling the footage from the east camera to determine what it showed. She responded no. She acknowledged that if the camera was operable and pointed in the direction of the aisle where Plaintiff fell, it could have depicted the accident and what occurred in the aisle prior thereto. *Id.* at pg. 45:5–20. Ms. Bollinger testified that the AP associate Arveta Nolan was responsible for identifying and preserving the relevant video footage after the accident. She testified that Ms. Nolan was no longer employed by Wal-Mart and she had not spoken with her in preparation for the deposition. *Id.* at pgs 47–49. Later in the deposition, Ms. Bollinger testified as follows:

> Q.  In fact, when you first walked in, you told me that camera didn't exist.
>
> A.  Yes, because to the best of my – I've seen all the shots in the garden center and there is no shot from this camera.
>
> Q.  You told me that there are four cameras in that area. You did not tell me about the east camera.
>
> A.  Yeah, because there's no shot from that camera. So I looked at the shots of the garden center and there's no shots from this camera, like no video image, no picture.
>
> Q.  You're agreeing with me that you said the camera didn't exist –
>
> A.  Oh, yeah, I'm agreeing, because I looked at the shots from AP. You know, looking at the cameras, there's no shot from a camera

there.  So it wouldn't exist to me; you know what I mean?

*Id.* at *Exhibit 9*, Bollinger deposition, pg. 80:11 to 81:2.

Ms. Bollinger further testified that her knowledge of the surveillance cameras in the garden center was based on viewing the video feeds from those cameras in the video room. *Id.* at pg. 81:5–14.

Under questioning by Wal-Mart's counsel, Ms. Bollinger testified that she has gone into the video room one or two times each workday during the eight years she has worked as an assistant manager and co-manager at the store. She has never seen "a shot," i.e., a video image, from the east camera "which is why I would say it didn't exist." *Id.* at pg. 85:5–25. Ms. Bollinger testified that if a camera was located in the camera dome shown in the photograph, it would be a fixed camera that faced in a single direction. She did not know of any reason why a camera at that location would be directed at the aisle in which the accident occurred. *Id.* at pgs. 86-88. Ms. Bollinger further testified that during a break in the deposition, she called the current AP associate at the store, "Albert," who informed her that the east camera was not operational. This was determined by Albert going through the list of cameras that were operational. *Id.* at pg. 88–89.

Defendant filed with its opposition a declaration by Arveta Nolan, the AP associate who was on duty on the date of the subject accident. Ms. Nolan states that on October 27, 2013, she was notified of the accident and promptly panned the PTZ camera toward the incident area. She also states that she preserved approximately two hours of footage from the PTZ camera, approximately one hour before and one hour after the incident. Ms. Nolan further states:

> 5.  I checked the store's surveillance cameras on October 27, 2013, and PTZ 8 was the only camera which was capable of capturing the incident area. The other camera shots in the Garden Center were from fixed cameras, and I confirmed that none of those cameras had a shot of the incident, the incident area, or any of the aisles next to the incident area.
>
> 6.  I have seen a photograph of a hanging camera dome that Ms. Fowler's attorney described as the "east camera." I have no knowledge whether the dome has a camera, but I do know that there was not a shot available from that dome or camera when I searched for footage on October 27, 2013.

*Opposition* (ECF No. 23), *Declaration of Arveta Nolan.*

Defendant also filed a declaration by David Whiteside, the current Asset Protection Manager for

6

1  the Wal-Mart store. Mr. Whiteside states that he inspected the "east camera" on January 24, 2017 by
2  opening the "dome" in which it is contained. Mr. Whiteside states that the camera is a fixed position
3  camera and its lense is facing south, perpendicular to the aisle in which the accident occurred.
4  *Opposition* (ECF No. 23), *Declaration of David Whiteside.*
5       The time clock on the preserved video from the PTZ 8 camera begins at 1:58.58 P.M. on
6  October 27, 2013. *Motion (ECF No. 21), Exhibit 2.* At that time, the camera was pointed at the
7  customer checkout counters and remained in that position until it was redirected at 2:59:20 P.M. to
8  depict the aisle in which the accident occurred. Plaintiff was sitting on the floor approximately midway
9  down the aisle with her back to the camera. A male individual who appeared to be a Wal-Mart
10 employee was sitting in motorized chair behind her. Two individuals, who appeared to be customers,
11 were also in the aisle and appeared to be keeping Plaintiff company. A short time later, the employee in
12 the motorized chair left the aisle. Another Wal-Mart male employee entered the aisle and spoke with
13 Plaintiff (there is no audio on the recording). The employee in the motorized chair also returned. At
14 approximately 3:02 P.M., Ms. Bollinger entered the aisle and met with Plaintiff who was still on the
15 floor. Ms. Bollinger pointed to something on the floor which presumably was the foreign substance.
16 At 3:03:53 and 3:04:15, the camera operator zoomed in to show the foreign substance on the floor near
17 the front of the aisle (in relation to the camera location). At 3:05:10, an employee drove a motorized
18 shopping cart into the aisle for Plaintiff to sit on. This appeared to be the same employee who spoke
19 with Plaintiff earlier. Between approximately 3:06 and 3:14 P.M., Plaintiff attempted to get up from
20 the floor to sit on the motorized shopping cart, but was unable to do so. Plaintiff was a heavy-set
21 individual and she appeared to be unable to place her weight on one or both legs. At 3:10:07, Ms.
22 Bollinger appeared to take a roll of paper towels out of the basket on the motorized shopping cart and
23 clean-up or place the towels on the foreign substance located near the front of, but still within, the aisle
24 in which Plaintiff was located. At 3:11:25, Ms. Bollinger appeared to wipe up the foreign substance.
25 At approximately 3:12:10, Ms. Bollinger wiped the bottoms of Plaintiff's "flip-flop" slippers.
26      At 3:13:19, Plaintiff was turned around, facing toward the camera, while still seated on the
27 floor. The male employee turned the motorized shopping cart around and brought it forward next to
28 Plaintiff, also facing in the direction of the camera. A large, heavy-set male employee had already

7

entered the aisle. That employee, together with the other male employee and Ms. Bollinger, lifted Plaintiff onto the cart at 3:13:45 P.M. At 3:14:15, the camera zooms out to show paper towels apparently covering the foreign substance located near the front of the aisle. At 3:15:24, Plaintiff made a call on her cell phone. At 3:17:55, Ms. Bollinger presented Plaintiff with a document on a clipboard which was presumably the Customer Incident Report that she completed and signed. *See Motion* (ECF No. 21), *Exhibit 4*. The large heavy-set male employee and Ms. Bollinger remained in the aisle while Plaintiff filled out the document. At 3:25:47, Plaintiff handed the completed form(s) to the male employee, who handed them to Ms. Bollinger.

At 3:26:10 P.M., Plaintiff, Ms. Bollinger and the male employee moved forward out of the aisle in the direction of the camera. At this time, the camera operator zoomed the camera lens out to show the aisle from which Plaintiff was coming and the main cross-aisle that she was entering. A female employee was kneeling in front of and facing toward the endcap on the row of shelves to right of the aisle from which Plaintiff was exiting. Ms. Bollinger was standing behind the female employee, apparently looking at the form(s) that Plaintiff had completed. As Plaintiff turned to her left (or to the right from the camera's point of view) into the main cross-aisle, the female employee stood up and moved further to the right facing into the next aisle where she bent down and appeared to wipe up another substance. As Plaintiff, Ms. Bollinger and the heavy-set male employee proceeded down the main aisle toward the exit, the female employee moved in the same direction and bent down to wipe something up near the endcap of the next row of shelves. Ms. Bollinger was standing next to the female employee at this point and would appear to have been able to observe what she did.[3] The PTZ 8 camera operator continued to follow Plaintiff, Ms. Bollinger and the heavy-set male employee as they passed by the customer checkout counters, turned to the right and then proceeded out of view presumably toward the exit at 3:27:03. The camera remained pointed toward the exit area until the recording stopped at 3:58:25 P.M.

Plaintiff argues that Defendant Wal-Mart should be sanctioned for its failure to preserve

---

[3]Plaintiff testified that she observed the employee wiping up the substances as she exited the store. She did not know whether the substances being wiped up were similar to the substance on which she slipped. *Opposition* (ECF No. 23), *Exhibit F*, Plaintiff's deposition, pgs 58-59.

relevant video recordings from the "east camera" which may have depicted Plaintiff's slip and fall accident and also revealed when and by whom the foreign substance was deposited on the floor. Plaintiff also argues that Wal-Mart should be sanctioned for failing to preserve video recordings from the fixed camera that was pointed at the fire exit door in the garden center. The area depicted by this camera is shown in the still photograph from the video on page 8 of Wal-Mart's Opposition (ECF No. 23). Although this camera did not depict the aisle in which the accident occurred, or an adjacent aisle, Plaintiff argues that video from this camera could have shown whether and when Wal-Mart employees conducted safety sweeps in the garden center prior to the accident. Plaintiff also argues that video from this camera might have provided information as to who or what caused the spill. Finally, Plaintiff argues that Wal-Mart should be sanctioned for failing to take photographs of the foreign substance(s) that the Wal-Mart employee is shown cleaning up as Plaintiff, Ms. Bollinger and the male employee exited the aisle in which Plaintiff fell and proceeded toward the exit.

Defendant argues that there is no basis for the imposition of sanctions. It asserts that the evidence establishes that the "east camera" was not operational on the date of the accident and, in any event, was pointed in a direction away from the aisle in which the accident occurred. Defendant argues that it is mere speculation to believe that the video recordings from the fixed camera pointed toward the fire exit door would have disclosed any relevant information. Finally, Wal-Mart contends that there is no reasonable basis to connect the substances that the employee was shown wiping up as Plaintiff was exiting the store to the foreign substance on which Plaintiff slipped. Defendant therefore argues that it did not have a duty to photograph those substances.

## DISCUSSION

An owner or occupier of premises is liable for an injury to its invitee that was caused by an unreasonably dangerous condition on its premises, if the owner had actual or constructive notice of its presence. *Sprague v. Lucky Stores, Inc.*, 109 Nev. 247, 250, 849 P.2d 320, 322-23 (1993); *Asmussen v. New Golden Hotel Co.*, 80 Nev. 260, 262, 392 P.2d 49, 50 (1964). "Where a foreign substance on a floor causes a patron to slip and fall, and the business owner or one of its agents caused the substance to be on the floor, liability will lie, as a foreign substance on the floor is usually not consistent with the standard of ordinary care." *Sprague*, 109 Nev. at 250, 849 P.2d at 322. "Where the foreign substance

is the result of actions of persons other than the business or its employees, liability will lie only if the business had actual or constructive notice of the condition and failed to remedy it." *Id.* Constructive notice exists if the foreign substance was present for such a length of time that the business owner, in the exercise of reasonable diligence, should have discovered and removed it. *Zumbusch v. Wal-Mart Stores, Inc.*, 940 F. Supp.2d 1308, 1314 (D. Or. 2013) (citing *Van Den Bron v. Fred Meyer, Inc.*, 86 Or.App. 329, 331, 738 P.2d 1011, 1012 (1987)); *Adams v. Valley Hope Association*, 2012 WL 12903146, *2 (D. Ariz. June 28, 2012) (citing *Walker v. Montgomery Ward & Co.* 511 P.2d 699, 702 (Ariz. App. 1973)). The injured person's ability to prove that the business owner had actual or constructive notice may well depend on evidence that is substantially, if not exclusively, in the control of the owner and its agents.

A party has a duty to preserve evidence that it knows or should know is relevant to a claim or defense of any party in the litigation. The duty to preserve evidence arises prior to litigation when the person knows that litigation is probable. *In re Napster Inc. Copyright Litigation*, 462 F.Supp.2d 1060, 1068 (N.D.Cal. 2006) (citing *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003)). *See also Surowiec v. Capital Title Agency, Inc.*, 790 F.Supp.2d 997, 1005 (D.Ariz. 2011) ("the duty to preserve evidence is triggered 'not only during litigation, but also extends to the period before litigation when a party should reasonably know that evidence may be relevant to anticipated litigation.' *Morford v. Wal-Mart Stores, Inc.*, No. 2:09-cv-02251-RLH-PAL, 2011 WL 635220, at *3 (D.Nev. Feb. 11, 2011).").

In *Demena v. Smith's Food & Drug Centers, Inc.*, 2012 WL 3962381, *2 (D.Nev. Sept. 10, 2012), the court noted that while all slip and fall incidents may not result in litigation, the owner of premises is placed on notice of the probability of litigation when the customer is injured, completes an incident report at the scene, and requires or appears to require medical treatment. *See also Roberts v. Smith's Food & Drug Centers, Inc.*, 2014 WL 2123213, *4 (D.Nev. May 21, 2014). In this case, Wal-Mart knew that Ms. Fowler had been injured in the slip and fall. She completed an incident report indicating her knee was dislocated. She was unable to lift herself off the floor and had to be assisted onto a motorized shopping cart by Wal-Mart's employees, including the assistant manager. Wal-Mart was therefore on notice shortly after the accident of the likelihood of litigation. Additionally, Ms.

Fowler's attorney notified Wal-Mart's claims adjuster of her claim three days after the accident and requested that it preserve and produce relevant evidence, including photographs and video recordings.

The court has the inherent authority to impose sanctions based on a party's failure to preserve relevant evidence prior to litigation. *United States v. $40,955.00 In U.S. Currency,* 554 F.3d 752, 758 (9th Cir.2009); *Leon v. IDX Sys. Corp.,* 464 F.3d 951, 958 (9th Cir.2006); and *United States v. Kitsap Physicians Serv.,* 314 F.3d 995, 1001 (9th Cir.1992). *See also Anderson v. Wal-Mart Stores, Inc.*, 2011 WL 4621286, at *3-*4 (D.Nev. 2011) and 2012 WL 300878, *2 (D.Nev. Feb. 1, 2012). The forms of sanction may include (1) an instruction to the jury that it may draw an inference adverse to the party or witness responsible for destroying the evidence, (2) an order excluding witness testimony proffered by the party responsible for destroying the evidence, or (3) a dispositive order dismissing the complaint or entering a default judgment. *In re Napster,* 462 F.Supp.2d 1060, 1066 (N.D.Cal.2006). *See also Powell v. Texvans, Inc.,* 2011 WL 1099120, *4 (D.Nev.2011); *Morford v. Wal-Mart Stores, Inc.,* 2011 WL 635220, *3 (D.Nev.2011). While a finding of bad faith is not required for the imposition of sanctions, "a party's motive or degree of fault in destroying evidence is relevant to what sanction, if any, is imposed." *In re Napster,* 464 F.Supp.2d at 1066–67 (citing *Baliotis v. McNeil,* 870 F.Supp. 1285, 1291 (M.D.Pa.1994)). Courts should choose "the least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim." *Schmid v. Milwaukee Electric Tool Corp.,* 13 F.3d 76, 79 (3rd Cir.1994); *Dillon v. Nissan Motor Co., Ltd.,* 986 F.2d 263 (8th Cir.1993). *See also Leon v. IDX Systems Corp.,* 464 F.3d 951, 959 (9th Cir. 2006).

In order to impose an adverse inference instruction based on the destruction of relevant evidence, the party seeking the sanction must establish that (1) the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the evidence was destroyed with a culpable state of mind; and (3) the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *In re Napster*, 464 F.Supp.2d at 1078.

**1. Defendant's Alleged Failure to Preserve and Produce Video From the So-Called "East Camera."**

Plaintiff argues that Defendant should be sanctioned for its failure to preserve and produce

video recordings from the so-called "east camera."  Plaintiff also asserts that Defendant should be bound by the testimony that Ms. Bollinger gave at the Rule 30(b)(6) deposition on November 14, 2016 and not be permitted to supplement that testimony with the declarations of Ms. Bollinger, Arveta Nolan and David Whiteside that were filed with its opposition.  The Court rejects the latter argument for the following reasons:  The second amended notice of Rule 30(b)(6) deposition served on October 27, 2016 required the Defendant to testify about "the surveillance videos at the subject Wal-Mart Stores on the day of the accident which were capable of capturing video footage relevant to the plaintiff's fall, the efforts taken to preserve surveillance video of the accident and of the events surrounding the accident and the reasons why Wal-Mart Stores has not preserved surveillance video that existed as of October 27, 2013."  Prior to serving the deposition notice, Plaintiff observed the east camera dome and took a photograph of it.  Plaintiff knew that Defendant had not produced any video recordings from that camera.  Plaintiff could have required in the notice that Defendant address the lack of video from the east camera location.  If she had done so, then Defendant would have had no excuse for not being fully prepared to testify about that camera and the absence of any preserved video recording from it.  The amended notice of deposition, however, did not alert Defendant to this specific issue.  Ms. Bollinger testified on November 14, 2016 that she was not aware of the east camera and the transcript indicates that she was surprised when confronted with the information about the existence of this camera location.  While it is possible that Ms. Bollinger was not candid about her lack of knowledge regarding the east camera, such a conclusion cannot be drawn from the current record.

      Because Ms. Bollinger was not prepared to testify about the east camera, Plaintiff could have adjourned the deposition to be resumed later once Wal-Mart had conducted further investigation regarding the east camera.  As the court stated in *Great American Ins. Co. of N.Y. v. Vegas Const.*, 251 F.R.D. 534, 540 (D.Nev. 2008), "[i]f an organization designates a witness it believes in good faith would be able to provide knowledgeable responsive testimony and it becomes apparent during the deposition that the designee produced is unable to respond to relevant areas of inquiry, the responding party has a duty to designate an additional knowledgeable deponent."  Instead of requesting Wal-Mart to produce a deponent who was knowledgeable about the east camera, Plaintiff allowed discovery to close and then filed her motion for sanctions.  In responding to that motion, Defendant was entitled to

provide the factual information about the east camera to refute the assertion that it recorded potentially relevant information that Defendant failed to preserve.

There is, at minimum, a genuine issue of fact as to whether the east camera was operational on the day of the accident or was pointed at the aisle in which Plaintiff slipped and fell. While Plaintiff may be able to challenge the credibility of Defendant's witnesses at trial regarding this camera, no conclusion can be made on this record that their testimony is false, and that the east camera was capable of recording Ms. Fowler's accident or the relevant events that preceded it. Plaintiff's motion for sanctions with respect to the east camera must therefore be denied.

> 2. **Defendant's Failure to Take Photographs of the Apparent Foreign Substance in the Main Cross-Aisle.**

Plaintiff argues that Defendant should be sanctioned for not taking photographs of the substances that the female employee is shown wiping up in the main cross-aisle as Plaintiff exits the store. With respect to this argument, the first question to be addressed is the actual time of the accident. Ms. Bollinger listed the time in her witness statement as 2:40 P.M. *Motion* (ECF No. 21), *Exhibit 6*. Plaintiff appears to accept this time in her motion. *Id.* at pg. 3. The evidence before the Court, however, raises doubt about the accuracy of this time. Ms. Bollinger testified that the PTZ 8 camera was rotated to the accident aisle after it was reported. *Id.* at *Exhibit 9*, pg. 28. Arveta Nolan states that she preserved video from the PTZ 8 camera "approximately one hour before I was notified of the accident and approximately one hour afterward." *Id.* at *Nolan Declaration*, ¶ 4. The preserved video recording starts at 1:58:58 P.M. The PTZ 8 camera was redirected to the aisle in which Plaintiff fell at 2:59:20 P.M. These statements suggest that the accident occurred closer to 3:00 P.M. than 2:40 P.M. It seems unlikely that 19 minutes would have passed from the time the accident occurred until it was reported to Ms. Nolan. If other evidence exists to support 2:40 P.M. as the accident time, it has not been provided to the Court.

Defendant has vociferously argued that there is no reasonable basis to believe that foreign substances on the main cross-aisle floor at 3:26 P.M. are related to the substance on which Plaintiff slipped. This argument loses force, however, if the time between the two events is closer to 26 minutes than 46 minutes. In addition, the video shows Ms. Bollinger putting paper towels down and wiping up

13

the foreign substance at the front of the accident aisle at 3:10 P.M. It is therefore not completely unlikely that an employee would be cleaning up related substances in the main cross-aisle at 3:26 P.M.

Ms. Bollinger's testimony shows that she did nothing to investigate the source of the foreign substance in the aisle where Plaintiff fell or how long it had been present prior to the accident. There is no indication that she interviewed any store employees or customers to determine if they had any knowledge of where the foreign substance came from or how long it had been present on the floor.[4] There is no indication from the video recording that Ms. Bollinger inspected the substances that the female store employee is shown wiping up at 3:26 P.M., even though Ms. Bollinger stood and walked by that employee as she wiped up the substances. Ms. Bollinger could have potentially resolved the possible connection between the substances by inspecting and photographing the substances on the floor in the main cross-aisle. Given the proximity in location and time between the foreign substances in the aisle where Plaintiff fell and the substances in the main cross-aisle, Defendant had a duty to inspect and photograph the latter substances as potentially relevant evidence. Although the trier of fact could find that the substances were not related, there is a reasonable possibility that they were part of the same continuous spill. Because Wal-Mart negligently failed to preserve evidence regarding the substances in the main cross-aisle, the jury should be instructed that they can infer that the substances were part of the same spill that caused Plaintiff's fall.[5]

### 3. Defendant's Failure to Preserve Video Recordings from the Camera Pointed at the Fire Exit Door.

Plaintiff argues that Defendant also had a duty to preserve video recordings from the camera pointed at the garden center fire exit door because such video may have shown whether and when Defendant's employees conducted safety sweeps in the garden center area prior to Plaintiff's slip and

---

[4]In its responses to interrogatories, Defendant stated: "*Upon information and belief*, a customer spilled the liquid and did not report the spill to Defendant's agents prior to the incident." *Defendant's Opposition to Plaintiff's Motion to Strike Declarations* (ECF No. 340), *Exhibit C*, Responses to Interrogatory Nos. 7, 9, and 10 (emphasis added). This response shows that Defendant has no actual knowledge as to how the substance came to be on the floor.

[5]The Court makes no determination that such an inference is sufficient to create a triable issue of fact as to whether Defendant had constructive notice of the foreign substance prior to Plaintiff's accident.

fall. Plaintiff's argument is predicated on *Patton v. Wal-Mart Stores, Inc.*, 2013 WL 6158467 (D.Nev. Nov. 20, 2013).

In *Patton*, a customer slipped and fell on water in a store aisle. A store employee who was stocking merchandise testified that prior to the accident, he pulled his cart through the aisle and past the area where plaintiff subsequently slipped. The employee testified that he was facing forward as he pulled his cart so that he could observe the floor in front of him. He did not observe water or any other hazard in the aisle. Approximately a minute later, the employee heard a scream and observed plaintiff lying on the floor near a pool of water. Defendant demonstrated that surveillance cameras would not have captured the slip and fall accident itself. A surveillance camera, however, was pointed at the east entrance to the aisle and would have shown the employee entering that aisle. In holding that Wal-Mart improperly failed to preserve video from that camera, the court stated:

> The initial problem with Walmart's argument, and its document preservation directive, however, is that "nothing" is something. Even if "nothing" was caught on film, camera five's video footage is probative because it tends to make the fact that Walmart maintained safe premises more probable than naught. *See* Fed R. Evid. 401. "Nothing" would show: (1) an empty and unobstructed east entrance; (2) rows of barbeque sauce and other liquids that had not fallen or leaked; and (3) a ceiling that kept water from dripping down and pudding (sic) on the floor. "Nothing," therefore, would be central to Patton's negligence claim because nothing would tend to show that Walmart did not breach its duty of care.
>
> Something rather than "nothing," however, was caught on film. The video footage from the time before Patton's fall was reported must have recorded Burton either pushing or pulling his cart. If Burton was pushing the cart then camera five's video footage would tend to make Patton's allegation that Walmart failed to properly inspect the aisle four [sic] more probable than not because Burton could not have seen obstructions, like a puddle of liquid, as he entered aisle four. *Id.* But, because Walmart's document preservation directive purportedly instructed employees to only preserve video footage after the incident was reported, Walmart's policy prevented Patton from discovering relevant evidence.

*Patton*, 2013 WL 6158467 at *5.

The lesson that *Patton* provides, which is consistent with the case law generally, is that what constitutes potentially relevant evidence should be construed fairly broadly. Thus, although a video recording may not depict the accident itself, or show when and how the foreign substance was deposited, it may show other events or circumstances that are relevant to determining what happened.

There must, however, be reason to believe that destroyed video recordings contained relevant information or evidence in order for sanctions to be imposed. Sanctions should not be imposed based on mere speculation that the video may have provided useful information.

The camera that was pointed at the fire exit door depicted two aisles at the south end of the garden center. *See Opposition* (ECF No. 23), pg. 8. These aisles were separated from the aisle in which Plaintiff fell by two other aisles. The camera would not have shown any foreign substances located in the main cross-aisle. There is no indication that any foreign substances were found in the aisles covered by this camera. Defendant argues that video from this camera may have shown when employees performed inspection sweeps in the garden center prior to the accident. Defendant has not claimed, however, that the aisle in which Plaintiff slipped was inspected a few minutes before the accident thus eliminating the possibility that the substance was present for a considerable period of time. Nor would the absence of evidence that an employee conducted a walk-through inspection in the aisles covered by the fire exit camera mean that such an inspection was or was not conducted in the aisle where Plaintiff fell. While the Court does not rule out the possibility that video from the fire exit camera could have revealed something relevant to the accident, such speculation does not justify the imposition of sanctions. The circumstances in this case are therefore distinguishable from those in *Patton*.

A defendant who violates its duty to preserve evidence relevant to anticipated litigation should suffer the appropriate sanction. The plaintiff, however, also has a duty to use reasonable efforts to prosecute her case and pursue discovery of relevant evidence. In this case, Plaintiff retained an attorney shortly after the accident, but then waited nearly two years before filing her lawsuit. Although the action was filed before the statute of limitations expired, such delay increases the possibility that relevant information will be lost–particularly in the form of faded witness recollections. In its answers to interrogatories, Defendant identified ten employees, in addition to Ms. Bollinger, who were working on the date of the accident and in the area where it occurred. Defendant also identified another six maintenance associates who were working in the store on the date of the accident. *Defendant's Opposition to Plaintiff's Motion to Strike Declarations* (ECF No. 340), *Exhibit C*, Responses to Interrogatories, pgs 9-10. The surveillance video from the PTZ 8 camera showed three employees, in

addition to Ms. Bollinger, in the accident aisle after Plaintiff's fall.  There is no indication that Plaintiff made any effort to identify those particular employees and take their depositions.  Nor is there any evidence that Plaintiff attempted to identify and depose the female employee who wiped up the substances in the main cross-aisle.  Although such discovery might have been a dead end, it is possible that it could have produced evidence to show how and when the spill(s) occurred.  The deficiencies in Defendant's accident investigation do not warrant the imposition of severe sanctions simply to save Plaintiff's counsel from the consequences of their own failure to pursue relevant discovery.

## CONCLUSION

Sanctions are not warranted against Defendant based on its alleged failure to preserve video from the so-called east camera or from the camera pointed at the fire exit door.  Defendant did breach its duty to inspect and photograph the substances that the employee was shown cleaning up in the main cross-aisle as Plaintiff was departing the store.  The appropriate sanction for this breach is an adverse inference jury instruction.  Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Strike Defendant's Answer (ECF No. 21) is **granted**, in part, and **denied**, in part, as follows:  The jury should be instructed that it may infer that the substances in the main cross-aisle were part of the same spill that deposited the foreign substance on which Plaintiff slipped and fell.   Sanctions are not warranted for Defendant's alleged failure to preserve relevant surveillance video.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike Declarations (ECF No. 29) is **denied**.

DATED this 9th day of March, 2017.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge

